# In the United States Court of Federal Claims

No. 20-1116 C
Originally Filed: January 21, 2021
Re-issued: February 8, 2021 [1]

_____

|  |  |
|---|---|
| IAP WORLD SERVICES, INC., | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| *Defendant,* | ) |
| | ) |
| and | ) |
| | ) |
| VECTRUS-J&J FACILITIES SUPPORT, LLC, | ) |
| | ) |
| *Defendant-Intervenor.* | ) |

_____

*Anuj Vohra*, Crowell & Moring LLP, Washington, DC, for Plaintiff. *Abigail Stokes*, *Robert Sneckenberg*, and *Alexandra Barbee-Garrett*, of counsel.

*Galina I. Fomenkova*, Trial Attorney, United States Department of Justice, Civil Division, Washington, D.C., with whom were *Jeffrey Bossert Clark*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Steven J. Gillingham*, Assistant Director, of counsel, for the Defendant. *Sandra C. Simmons*, *Nicolle A. Vasquez*, and *Seth M. Eddy*, United States Department of the Navy, Office of the General Counsel, NAVFAC Atlantic, of counsel.

*Adam K. Lasky*, Seyfarth Shaw LLP, Seattle, WA, for Defendant-Intervenor. *Bret C. Marfut*, *Steven J. Kmieciak*, and *Sara Rogers*, of counsel.

## OPINION AND ORDER

**MEYERS, Judge**.

     IAP World Services, Inc. ("Plaintiff" or "IAP") filed this post-award bid protest to challenge the award of a Base Operations Services contract to provide services to Navy Support

---

[1] The Court initially filed this opinion under seal so that the Parties could propose redactions. The redactions are indicated by bracketed ellipses ("[ … ]") below.

Activity, Annapolis. Plaintiff raises a number of challenges to the contract award regarding the technical evaluation, price evaluation, and best value tradeoff and seeks: (1) a declaration that the contract awarded by the United States, acting through the U.S. Navy (the "Government" or "Navy"), to Defendant-Intervenor Vectrus-J&J Facilities Support, LLC ("Intervenor" or "VJFS") was arbitrary and capricious; (2) a permanent injunction prohibiting the Navy from commencing performance of the contract awarded to VJFS and requiring corrective action including a new evaluation of proposals and new award decision; and (3) other relief.

While the Court denies most of IAP's motion, IAP is correct that the Administrative Record does not reflect the Navy ever analyzed proposals for unbalanced pricing, which is required under the Federal Acquisition Regulation ("FAR"). Therefore, Plaintiff's Motion for Judgment on the Administrative Record is Granted-in-Part insofar as it seeks a remand to the Navy to perform an unbalanced pricing analysis and Denied in all other respects. The Government's and VJFS's Cross-Motions for Judgment on the Administrative Record are Granted-in-Part and Denied-in-Part as to Counts I-IV of IAP's Complaint. The Court remands the procurement to the Navy to perform and document the unbalanced pricing analysis required by the FAR. The Court DEFERS entering judgment on Count V until after the conclusion of the remand.

I.     **Factual and Procedural Background.**

       A.     **The Solicitation.**

       On October 22, 2018, the United States, acting through the U.S. Navy, issued Request for Proposal N62470-16-R-5008 (the "RFP") for Base Operation Support ("BOS") services to Navy Support Activity, Annapolis, which includes the United States Naval Academy. RFP § A.2, AR Tab 80a at 13598-99. The contemplated BOS contract encompasses numerous services including facility management, utilities management, maintenance, pest control, event services, and other activities. The RFP's performance requirements are organized in a series of technical specifications contained in Performance Work Statement ("PWS") annexes – Annex 01-02, 15-17. RFP § C.1, AR Tab 80a at 13610. The RFP provides for an award to the offeror whose proposal is most advantageous to the Government "price and other factors considered." *Id.* § M.1, AR Tab 80a at 14060. Further, the RFP expressly "allow[ed for] consideration of award to other than the lowest priced Offeror or other than the highest technically rated Offeror," *i.e.*, a best value tradeoff. *Id.* The RFP was amended fourteen times, most recently on February 25, 2020. AR Tabs 10-21, 49, & 52.[2]

       The RFP provides for a 12-month base period and six option periods of 12 months each, for a total contract term of 84 months. RFP § B.2, AR Tab 80a at 13600. For each period of performance, there are two Contract Line Items ("CLINs")—"Recurring Work" and "Non-Recurring Work." *Id.* § A.2, AR Tab 80a at 13598-99. As the Navy explained, "Recurring Work CLINs are [Firm Fixed Price] CLINs, in which the Agency pays a fixed price for a certain set of defined services over the course of that period of performance." AR Tab 80 at 13542 (Agency Report in GAO Protest). Thus, Recurring Work covers those tasks that the Navy

---

[2] Because the issues presented are not impacted by specific amendments to the RFP, all references are to the conformed version of the RFP at AR Tab 80a unless otherwise indicated.

anticipated it would need each year and in quantities that were predictable (*e.g.*, preventative maintenance, operational support, and inspection services). Non-Recurring Work, however, covered tasks that likely would be needed but in quantities that were unpredictable (*e.g.*, replacing failed or broken equipment, building painting, carpet replacement, *etc.*). Therefore, "Non-Recurring Work CLINs operate in an IDIQ manner, with orders being placed at established rates for certain work items on an as-needed basis." *Id.*

     1.    <u>Non-Price Proposals.</u>

Offerors were required to submit their proposals in two volumes—Volume 1: Price Proposal and Volume 2: Non-Price Proposal. RFP § L.4, AR Tab 80a at 14047. The Navy evaluated the non-price proposal using four factors: Corporate Experience (Factor 1); Safety (Factor 3); Small Business Utilization (Factor 4); and Past Performance (Factor 5).[3] *Id.* § L.5, AR Tab 80a at 14047.

For Factor 1, Corporate Experience, offerors were to submit a minimum of one and a maximum of five examples of relevant projects to "demonstrate relevant prime contractor experience on projects similar in size, scope, and complexity to the requirements described in the PWS." *Id.* § L.6, AR Tab 80a at 14051. The PWS incorporated sixteen technical specifications that covered different types of work to be performed, including Facility Management, Pest Control, Special Events, Utility Management, Steam, Chiller Plant, and others. *Id.* § C.1, AR Tab 80a at 13610. To be considered relevant, offerors were required to show that each project for BOS services included showing the performance of:

- technical specification 1502000 – Facility Investment,

- one (1) of the Utilities technical specifications (either 1602000 – Electrical, 1603000 – Natural Gas, 1604000 – Wastewater, 1605000 – Steam, 1606000 – Water, or 1607000 [–] Chiller), and

  - Note: Technical specifications 0100000 – General Information, 0200000 – Management and Administration will not be considered or counted towards the minimum of one other technical specification required to demonstrate a relevant project under corporate experience.

---

[3] The RFP originally contained Factor 2, "Technical Approach/Management Approach." The Navy evaluated this Factor when determining the competitive range. AR Tab 40 at 10053-59 (evaluation of Factor 2 for IAP), 10075-82 (evaluation of Factor 2 for [ … ]), & 10083-89 (evaluation of Factor 2 for VJFS). After the competitive range determination, the Navy removed Factor 2 from consideration in Amendment 13. *See* AR Tab 49 at 10256 ("Section L has been revised . . . to remove Evaluation Factor 2 from consideration . . . ."). The overall weight of the remaining factors relative to each other remained unchanged. *See id.* § L.5, AR Tab 49 at 10277.

- a minimum of two (2) other technical specifications.

*Id.* § L.6, AR Tab 80a at 14051. In addition, at least one year of contract performance had to have been completed within eight years prior to the RFP issuance, and the contract value had to have been $10 million or more. *Id.*

Within Factor 1, the RFP explicitly addresses corporate experience of Joint Venture ("JV") offerors, saying "relevant experience should be submitted for projects completed by the Joint Venture entity." *Id.* The RFP further states, "Projects submitted by Joint Ventures where the Joint Venture firms performed together (either as partners or in a prime-sub relationship) may be viewed more favorably than projects submitted in which the Joint Venture firms did not perform together. If the Joint Venture does not have such experience, relevant experience shall be submitted for each Joint Venture partner." *Id.*; *see also id.* § M.2, AR Tab 80a at 14061 (same). Further, JV offerors were required to identify what portion of work they performed on past projects when those past projects were performed separately by JV members rather than the JV proposing here. *Id.* § L.6, AR Tab 80a at 14051-52. Similarly, all offerors were required to explain the amount of work that they self-performed on each project. *Id.* at 14052 (requiring the information on Attachment J-6); *see also* AR Tab 53b at 10934 (Box 9 of IAP's Attachment J-6 for a project requiring "a detailed description of what work your firm self-performed on this project").

Closely related to Corporate Experience is Factor 5, Past Performance. The RFP distinguished "Past Performance" from "Corporate Experience" as follows: "[C]orporate experience pertains to the types of work and volume of work completed by a contractor that are comparable to the types of work covered by this requirement, in terms of size, scope, and complexity. Past performance pertains to both the relevance of recent efforts and how well a contractor has performed on the contracts." RFP § L.5, AR Tab 80a at 14047. For each project submitted for Corporate Experience, offerors were required to submit a Contractor Performance Assessment Reporting System ("CPARS") evaluation or completed questionnaire if no CPARS report was available. *Id.* § L.6, AR Tab 80a at 14057. The Government reserved the right to review any other information regarding past performance. *Id.*

For Factor 3, Safety, the RFP requires offerors to explain their safety management systems and plans for evaluating potential subcontractors' safety. *Id.* at 14055. In addition, each offeror was required to provide three years of safety-related data. *Id.* These included an Experience Modification Rate, which measures a "company's annual losses in insurance claims against its policy premiums." *Id.* Other data include OSHA reportable cases and the number of days away from work resulting from safety issues. *Id.*

The final factor—Factor 4, Small Business Utilization—requires offerors demonstrate "historical achievements in utilizing small business concerns as subcontractors." *Id.* In addition to a narrative highlighting their achievements supporting small business subcontracting, offerors were required to include data regarding their small business utilization for each of the projects submitted for consideration for Factor 1. *Id.* at 14055-56. Further, offerors were required to specify their level of commitment to small business utilization for this project and provide their strategies for achieving their goals.

2.    Price Proposals.

While the RFP called for a significant amount of data to be submitted in Price Proposals, only a limited subset of that information is relevant here. Specifically, the RFP requires that each offeror provide Exhibit Line Items ("ELINs") pricing for Recurring and Non-Recurring Work for each period of performance. RFP § L.6, AR Tab 80a at 14048 (requiring pricing "for all ELINs for the Base Period and all Option Periods."). The ELINs represent the specific unit prices for each line item and a total price (the quantity multiplied by anticipated purchase quantities). Thus, "[i]n the event there is a discrepancy between the Section J ELIN pricing and the Section B CLIN price, the Section J ELIN will be held to be the intended offer, and the Section B CLIN will be adjusted accordingly." RFP § B.3, AR Tab 80a at 13600.

**B.    Evaluation Factors for Award.**

The technical factors – Corporate Experience (Factor 1), Safety (Factor 3), and Small Business Utilization (Factor 4) – were each of equal importance under the RFP. The combined technical factors were "of equal importance to the performance confidence assessment (past performance) rating [Factor 5]," and the non-price factors combined were "approximately equal to price." RFP § M.1, AR Tab 80a at 14060. The RFP further explains that "[t]he importance of price will increase if the offeror's non-price proposals are considered essentially equal in terms of overall quality, or if price is so high as to significantly diminish the value of a non-price proposal's superiority to the Government." *Id*. § L.5, AR Tab 80a at 14047.

The RFP outlined the evaluation process for each factor. For Corporate Experience, the RFP provides that "[t]he Government will evaluate the extent to which the Offeror demonstrates prime contractor experience in successfully performing projects of similar size, scope and complexity to this requirement within the last eight (8) years preceding the release date of the solicitation." *Id*. at 14060. "The assessment of the Offeror's relevant experience will be used as a means of evaluating the capability of the Offeror to successfully meet the requirements of the RFP." *Id*. For Safety, the RFP provided that the evaluation will collectively consider the offerors' historical safety statistics and technical approach to safety "to determine if the Offeror has demonstrated a history of safe work practices . . . ." *Id*. For Small Business Utilization, the Navy was to consider an offeror's historical achievements utilizing small business concerns and its commitment to do so in this procurement. *Id*. at 14062.

The Navy applied the following adjectival technical/risk ratings from its Source Selection Plan ("SSP") for the Corporate Experience, Safety, and Small Business Utilization:

**Combined Technical/Risk Rating Method**

| Adjectival Rating | Description |
| --- | --- |
| Outstanding (O) | Proposal indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low. |
| Good (G) | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate. |

| Acceptable (A) | Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| Marginal (M) | Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high. |
| Unacceptable (U) | Proposal does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable.  Proposal is unawardable. |

AR Tab 48 at 10229.

For Past Performance, the RFP states the Navy would "evaluate how well the Offeror performed on the relevant projects submitted under Factor 1 - Corporate Experience and on other relevant projects documented in known sources.  Relevancy is defined as set forth in Factor 1, Corporate Experience."  RFP § M.2, AR Tab 80a at 14062.  Further:

> The evaluation will consider the degree to which past performance evaluations and any other past performance information reviewed by the Government . . . reflect a trend of satisfactory performance considering:
>
> - A pattern of successful completion of tasks;
>
> - A pattern of deliverables that are timely and of good quality;
>
> - A pattern of cooperativeness and teamwork with the Government at all levels (task managers, contracting officers, auditors, etc.); and
>
> - Recency of tasks performed that are identical to, similar to, or related to the task at hand.

*Id.*

The Navy applied the following Past Performance relevancy ratings and performance confidence assessment ratings to each offeror's past projects:

### Performance Relevance Rating Method

| Adjectival Rating | Description |
| --- | --- |
| Very Relevant | Present/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. |
| Relevant | Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires. |
| Somewhat Relevant | Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. |

| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires. |

AR Tab 94 at 14800.

### Performance Confidence Assessments

| Adjectival Rating | Description |
|---|---|
| Substantial Confidence | Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. |
| Neutral Confidence | No recent/relevant performance record is available or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. The offeror may not be evaluated favorably or unfavorably on the factor of past performance. |
| Limited Confidence | Based on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort. |
| No Confidence | Based on the offeror's recent/relevant performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort. |

AR Tab 48 at 10230-31.

For Price, the RFP did not provide ratings but required the Navy to evaluate offerors' total pricing using "one or more" price analysis techniques "to ensure a fair and reasonable price." RFP § M.2, AR Tab 80a at 14060. Specifically, the RFP states that the Navy would use one or more of the following techniques: (1) Comparison of proposed prices received in response to the RFP; (2) Comparison of proposed prices with the Independent Government Cost Estimate ("IGCE"); (3) Comparison of proposed prices with available historical information; (4) Comparison of market survey results; and (5) Fair and reasonable CLIN and ELIN/unit pricing. *Id.* The RFP did not provide for a price realism evaluation.

### C. Evaluation of Proposals and Award.

The Navy received nine proposals in response to the RFP. After an initial evaluation of all nine proposals, on February 19, 2020 the Navy established a competitive range consisting of three offerors: IAP, VJFS, and [ … ]. AR Tab 45 at 10201-02. IAP and [ … ] proposed as standalone prime contractors; VJFS proposed as a JV consisting of two members – J&J Worldwide Services ("J&J") and Vectrus Systems Corporation ("Vectrus"). Discussions with the competitive range consisted of the Navy providing written questions to IAP, VJFS, and [ … ] regarding their respective technical proposals. *See generally* AR Tab 50. Following the written discussions, final proposal revisions were due March 3, 2020.

1.      Source Selection Evaluation Board Analysis.

The Source Selection Evaluation Board ("SSEB") conducted the first layer of review. The SSEB was comprised of a Technical Evaluation Team ("TET") and a Price Evaluation Team ("PET"). AR Tab 96 at 14835-36 (source selection plan). The TET conducted and documented an initial review of the non-price proposals of each of the offerors in the competitive range, assigned ratings to each non-price factor, and documented the risks and benefits that resulted in those ratings. AR Tab 94 at 14784.

In parallel, the PET evaluated price proposals "by comparing the proposed validated price received in response to the request for proposal to each other and to the Independent Government Estimate." AR Tab 56 at 12356. The PET concluded that "[b]ased on the analysis of price and the required proposal documentation, all Offeror's price proposals are considered fair and reasonable." *Id.* at 12359. The SSEB consolidated the findings of the individual price and technical evaluation teams. The SSEB's final non-price ratings for IAP and VJFS were as follows:

TABLE 1 – SSEB EVALUATION SUMMARY REPORT

| Offerors | Factor 1. Corporate Experience | Factor 2. Staffing Approach | Factor 3. Safety | Factor 4. Small Business Utilization | Factor 5. Past Performance | Validated Price (Total for all CLINS after validation) |
|---|---|---|---|---|---|---|
| IAP | Outstanding | Removed per Amendment 0013 | Outstanding | Good | Substantial Confidence | $168,337,041.06 |
| [ … ] | [ … ] | | [ … ] | [ … ] | [ … ] | [ … ] |
| VJFS | Good | | Good | Good | Substantial Confidence | $154,100,049.03 |
| Independent Government Cost Estimate (IGCE) | | | | | | [ … ] |

AR Tab 59 at 12434.

2.      Source Selection Advisory Council Analysis.

After receiving and reviewing the SSEB Report, the Source Selection Advisory Council ("SSAC") conducted an independent analysis of the evaluations. The SSAC incorporated TET's and PET's evaluations and conducted an analysis of each offeror's technical proposals (Factors 1, 3, and 4) to generate a Combined Technical Rating. AR Tab 59 at 12435-37. The SSAC then performed a comparative analysis of the proposals against each other, *id.* at 12437-42, and ranked each proposal as follows:

| Offerors | Factor 1. Corporate Experience | Factor 2. Staffing Approach | Factor 3. Safety | Factor 4. Small Business Utilization | Factor 5. Past Performance | Overall Technical Rating | Validated Price (Total Price for all CLINS) | Price Ranking | Overall Ranking |
|---|---|---|---|---|---|---|---|---|---|
| IAP | Outstanding | Removed per Amendment 0013 | Outstanding | Good | Substantial Confidence | Outstanding | $168,337,041.06 | 3 | 2 |
| [ … ] | [ … ] | | [ … ] | [ … ] | [ … ] | [ … ] | [ … ] | 1 | 3 |
| VJFS | Good | | Good | Good | Substantial Confidence | Good | $154,100,049.03 | 2 | 1 |
| Independent Government Cost Estimate (IGCE) | | | | | | | [ … ] | | |

AR Tab 59 at 12435.

Based upon its assessment, the SSAC determined that IAP's "slight non-price advantage" over VJFS did not justify IAP's 9.24% higher price. *Id.* at 12439.

### 3.   Source Selection Authority's Award Decision.

The Source Selection Authority ("SSA") reviewed and concurred with the TET's, PET's, and SSAC's analyses, and attended briefings with the SSEB and SSAC. AR Tab 60 at 12443. The SSA ultimately determined that the "price difference between the offerors outweighs the slight non-price advantage offered by IAP, which makes VJFS the best value of these Offerors." *Id.* at 12446. The SSA also noted that even if IAP were found to have a slight advantage in Past Performance, "such a slight difference does not offer any significant reduction in performance risk and is certainly not worth a price premium of 9.24%." *Id.*

Accordingly, on May 28, 2020, the Navy awarded the contract to VJFS. AR Tab 63.

## II.   Procedural History.

### A.   Protest before the Government Accountability Office.

On June 10, 2020, IAP filed a protest of the award decision with the Government Accountability Office ("GAO"), alleging that "VJFS materially misrepresented its proposal, and that the Navy unreasonably evaluated proposals and improperly made its source selection decision." AR Tab 91 at 14602. Specifically, IAP argued that the Navy improperly rated VJFS's past performance because of VJFS's lack of its own experience as a new JV and "the RFP's explicit preference for JV experience over individual JV partner experience." AR Tab 74 at 13495. IAP made similar arguments regarding the Corporate Experience, Safety, and Small Business factors based on VJFS's lack of its own experience in these areas. *Id.* at 13495-96. IAP then challenged the Navy's alleged failure to rate IAP's past performance highly enough and argued that the best value tradeoff was irrational based on IAP's ratings. *Id.* at 13496-97. IAP did not raise any challenge to the Navy's analysis of price proposals. The GAO denied IAP's

protest in full on August 20, 2020.  *Id.* at 14608.

**B.      Protest Before this Court.**

On September 1, 2020, IAP filed its bid protest with this Court.  On September 2, 2020, VJFS filed an unopposed Motion to Intervene.  On October 6, 2020, IAP filed its Motion for Judgment on the Administrative Record ("Pltf.'s MJAR").  ECF No. 35.  On November 3, 2020, the Government filed its Response and Cross Motion for Judgment on the Administrative Record ("Def.'s MJAR"), ECF No. 40, and VJFS filed its Response and Cross Motion for Judgment on the Administrative Record ("Int.'s MJAR"), ECF No. 41.  Plaintiff filed its Reply and Response to the Cross Motions ("Pltf.'s Reply") on November 10, 2020.  ECF No. 44.  The Government filed its Reply ("Def.'s Reply"), ECF No. 46, and VJFS filed its Reply ("Int.'s Reply"), ECF No. 45, on November 17, 2020.  This matter was transferred to the undersigned on November 23, 2020.  An extensive oral argument was heard on December 4, 2020, and this matter is ripe for review.

**III.    Jurisdiction and Standards of Review.**

**A.      Jurisdiction.**

28 U.S.C. § 1491(b)(1) provides that this Court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."

**B.      Motion for Judgment on the Administrative Record.**

When deciding a post-award bid protest such as this, the Court does so under the standards of the Administrative Procedure Act ("APA").  28 U.S.C. § 1491(b)(4) (incorporating the standards of 5 U.S.C. 706).  In analyzing a protest under the APA, "it is well established that the Court should not substitute its judgment to assess the relative merits of the competing proposals in a Government procurement."  *Crowley Tech. Mgmt. v. United States*, 123 Fed. Cl. 253, 260 (2015) (citations omitted).  Instead, "the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial."  *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013) (citing 28 U.S.C. § 1491(b)(4)'s adoption of the standard of 5 U.S.C. § 706).  In addition to violation of regulation, *see Glenn Def.*, 720 F.3d at 907 (finding conduct arbitrary and capricious when "'the procurement involved a violation of regulation or procedure.'") (quoting *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1285-86 (Fed. Cir. 2010)) (additional citation omitted), it is "arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009)

(alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

It is the Plaintiff that "'bears a heavy burden of showing that the award decision had no rational basis.'" *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1326 (Fed. Cir. 2011) (quoting *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)). This burden increases when greater discretion is afforded to the contracting officer. *E.g., Glenn Def.*, 720 F.3d at 907-08 ("'[T]he greater the discretion granted to a contracting officer, the more difficult it will be to prove the decision was arbitrary and capricious.'") (quoting *Burroughs Corp. v. United States*, 617 F.2d 590, 597 (Ct. Cl. 1980)). Therefore, in a best value procurement like this one, the Court "accords contacting officers an even greater degree of discretion." *Id.* (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)).

To show prejudice, the Plaintiff "must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protestor would have been awarded the contract." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (citations omitted).

C.    **Injunctive Relief.**

An injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curium) (citation omitted). Whether to grant an injunction lies within the sound discretion of the Court. When considering whether to grant permanent injunctive relief, this Court considers:

> (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citation omitted). Thus, a failure to succeed on the merits is fatal to Plaintiff's motion for an injunction. *Id.; Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 (Fed. Cir. 2018) ("Because proving success on the merits is a necessary element for a permanent injunction, we reverse the Court of Federal Claims' grant of an injunction."); *see also Acad. Facilities Mgmt. v. United States*, 87 Fed. Cl. 441, 473 (2009) (collecting cases). Moreover, an injunction is generally not appropriate when a less drastic remedy is available. *E.g., Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010) ("If a less drastic remedy (such as partial or complete vacatur of [the government's] deregulation decision) was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted.").

IV.    **Discussion.**

A.    **The Navy's past performance evaluation was rational and complied with the RFP.**

IAP argues that VJFS's Substantial Confidence rating for the Past Performance factor is "arbitrary, capricious, inconsistent with the RFP, and insufficiently documented." Pltf.'s MJAR at 12. As explained above, significant deference is given to procurement decisions in a negotiated procurement. *See also FirstLine Transp. Sec., Inc. v. United States*, 100 Fed. Cl. 359, 396 (2011) ("When the Court considers a bid protest challenge to the past performance evaluation conducted in the course of a negotiated procurement, 'the greatest deference possible is given to the agency.'") (quoting *Univ. Research Co. v. United States*, 65 Fed. Cl. 500, 505 (2005)). Thus, "a protestor must overcome a 'triple whammy of deference by demonstrating by a preponderance of the evidence that the [agency] lacked any rational basis' to assign a given past performance rating." *Fluor Intercontinental, Inc. v. United States*, 147 Fed. Cl. 309, 329 (2020) (quoting *Am. Auto Logistics, LP v. United States*, 117 Fed. Cl. 137, 186 (2014)) (additional citations omitted). IAP's challenge to the Navy's evaluation and rating of VJFS's Past Performance focuses on three alleged errors: (1) the Navy ignored the RFP's preference for offeror experience when it purportedly failed to recognize that VJFS did not perform on its own any of the projects it identified in its proposal; (2) the Navy failed to consider that VJFS documented experience in fewer technical specifications in its proposal; and (3) the Navy misinterpreted VJFS's proposal and incorrectly attributed all of another joint ventures' past project to [ … ] (one of VJFS's members). Pltf.'s MJAR at 14-15. These arguments, however, fail to find support in the Record.

1.    <u>The Navy did not "ignore" the RFP.</u>

Although this Court gives deference to agency determinations, that deference is not without limits, and agencies must follow the terms of their solicitation when awarding a contract. "[W]hen [an agency's] determinations are contradicted by the record; no amount of deference can save them from being overturned as arbitrary and an abuse of discretion." *DZSP 21, LLC v. United States*, 139 Fed. Cl. 110, 118 n.9 (2018); *see also CliniComp Int'l v. United States*, 117 Fed. Cl. 722, 741 (2014) ("[A]n 'agency's failure to follow the terms of its own Solicitation and selection of an offeror based upon different requirements than those imposed upon the only other offeror are quintessential examples of conduct which lacks a rational basis.'") (quoting *Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 273 (2004)). IAP contends that the Navy ignored an express preference in the RFP for experience by an offering JV (as opposed to experience by a JV's members) when evaluating VJFS's past projects. Pltf.'s MJAR at 14-15. By ignoring this preference, IAP argues that the Navy inflated the relevance of each of VJFS's past projects and, as a result, VJFS's overall Past Performance rating was wrongfully inflated. *Id*. at 15-16.

Under the Past Performance factor, the RFP required that projects must be relevant. RFP § M.2, AR Tab 80a at 14062. Relevance was defined the same way for both Corporate Experience and the Past Performance. *Id*. § L.6, AR Tab 80a at 14051. To be considered relevant, projects had to satisfy the following criteria:

(1) it must have been for BOS or equivalent services;

> (2) must demonstrate the offeror's performance of work categorized as "technical specification 1502000 – Facility Investment";
>
> (3) must demonstrate the offeror's performance of "one (1) of the Utilities technical specifications," which included work on systems including electrical, natural gas, wastewater, steam, water, or chiller;
>
> (4) must demonstrate the offeror's performance of at least two other technical specifications;
>
> (5) at least one year of the contract must have been performed in the previous eight years; and
>
> (6) the contract must have a value of at least $10 million per year.

*Id.* § L.6, AR Tab 80a at 14051.  There is no dispute that each project VJFS submitted in response to the RFP satisfies these threshold requirements. Rather, Plaintiff argues the repeated use of the phrase "Offeror's performance" in the RFP indicated a "clear preference for past projects that demonstrated the offeror's *own* experience" that the Navy purportedly disregarded in its evaluation.  Pltf.'s MJAR at 13 (emphasis in original).  But the RFP does not express such a clear preference.

The RFP specifically addresses how newly formed JVs like VJFS were to submit projects for consideration:

> If the Offeror is a Joint Venture, relevant experience should be submitted for projects completed by the Joint Venture entity. *Projects submitted by Joint Ventures where the Joint Venture firms performed together (either as partners or in a prime-sub relationship) may be viewed more favorably than projects submitted in which the Joint Venture firms did not perform together.  If the Joint Venture does not have such experience, relevant experience shall be submitted for each Joint Venture partner.*  JV Offerors are still limited to a total of five (5) relevant projects.

RFP § L.6, AR Tab 80a at 14051 (emphasis added).  Critically, as the Government and VJFS counter, the RFP does not say that projects performed by members of a JV *shall* be considered more favorably; it explicitly says that such projects *may* be considered more favorably.  *E.g., Anderson Consulting v. United States*, 959 F.2d 929, 932 (Fed. Cir. 1992) (recognizing the distinction between "the permissive 'may' [and] the mandatory 'shall'"); *see also* Def.'s MJAR at 22-23; Int.'s MJAR at 10-11.  Indeed, Plaintiff itself clearly understood this—its own brief candidly states that the RFP provided that "the Navy *might* consider . . . joint experience more favorably than experience of individual JV members."  Pltf.'s MJAR at 13 (emphasis added).  This recognition undermines Plaintiff's assertions of a "clear preference" that would necessarily treat a JV's self-performed projects more favorably than member-performed projects.  Indeed, it

would be incongruous for the Navy to make this provision permissive if there were such a clear preference for self-performed work. It also dispels the notion that the Navy was not permitted to rate VJFS's proposal as highly as IAP's because VJFS relied exclusively on projects performed by its members.

Further, Plaintiff raised this same argument to the GAO in its protest there. Although this Court is not required to follow the GAO's decisions, its rationale here is persuasive. The GAO concluded that "[b]ecause the RFP did not mandate that the agency evaluate the experience and past performance of an individual member less favorably (or otherwise assign a penalty for failing to provide experience and past performance attributable to the joint venture), we do not find that the agency's evaluation was inconsistent with the RFP." AR Tab 91 at 14605-06. In short, nothing in the RFP prohibited the Navy from rating VFJS's proposal as it did, and the Navy's evaluation was rational.

IAP advances a similar challenge to the Navy's technical evaluation because it allegedly failed to recognize or substantively consider that VJFS did not *itself* perform any of the projects that it submitted in its proposal. Pltf.'s MJAR at 14; Pltf.'s Reply at 7. This failure, according to Plaintiff, is evident because various reviews state that VJFS has experience based on the prior work of its component parts, not VJFS itself. *Id.*; *see also* Hearing Tr. at 17:19-18:1. There is, however, no doubt that the Navy clearly understood that VJFS itself did not perform the past projects but that its members did so. In its evaluation, the TET prepared summaries of each project submitted in each proposal. For VJFS, each one of these summaries clearly states both that the "Performing Entity" is other than VJFS and what percentage of the work was performed by the entity. AR Tab 58 at 12392 ("[ … ] JV, LLC"), 12394 ("[ … ]"), 12397 ("Vectrus Systems Corporation (Vectrus)"), 12401 ("Vectrus Systems Corporation (Vectrus)"), 12404 ("J&J Maintenance. Inc. dba J&J Worldwide Services"). Moreover, each one of the subsequent evaluations made clear that the reviewers reviewed and incorporated the TET Report. *See* AR Tab 58 at 12363 ("SSEB Documentation After Discussions"), 12434-37 ("SSAC Report After Discussions"), and 12443-44 ("Source Selection Decision Document"). There is no indication that any of these reviewers failed to understand that VJFS submitted proposals that were performed by its members rather than itself. As the GAO also recognized in its decision denying this argument, "the evaluation record shows that the agency documented the 'percent of work self-performed,' and was therefore aware of and considered the portions of work members completed when evaluating VJFS's corporate experience." AR Tab 91 at 14606.

Finally, IAP argues that because of the RFP's "significant weight placed on Past Performance and its preference for prime contractor experience of the offeror over experience of individual JV members," IAP chose not to submit a proposal in a JV with its major subcontractor. As a result, IAP claims it was prejudiced because it could have submitted a lower priced proposal as a JV. Pltf.'s MJAR at 16.[4] As addressed above, however, the RFP does not

---

[4] This argument is somewhat in tension with Plaintiff's arguments regarding the Navy's price evaluation, where Plaintiff says the price difference between it and VJFS is "in a word, inexplicable." Pltf.'s MJAR at 22. Of course, if IAP could have offered a materially lower price as a joint venture, which it must be arguing to establish prejudice here, a material part of VJFS's lower price is not "inexplicable."

provide "significant weight" to self-performed projects in the past performance evaluation criteria.  Indeed, the RFP provides no more than that the Navy "may," *not shall*, view a JV's self-performed projects more favorably than JV member-performed projects.  RFP § L.6, AR Tab 80a at 14051.  Clearly, Plaintiff's interpretation is at odds with the plain language of the RFP.  If the Navy had placed "significant weight" on JV self-performed projects as compared to JV member-performed projects, it would be wholly irrational to also provide that the evaluation of proposals *may* view JV self-performed projects more favorably.  That is what the Navy did here. It did not create an evaluation structure that necessarily treated JV member projects less favorably than those performed by the single entities.

In any event, IAP made a business judgment that it would not bid as part of a JV based on its interpretation of the RFP, which was not dictated by the terms of the RFP itself.  IAP cannot now bind the Navy and other offerors to its interpretation because "a disappointed offeror that has made a business judgment . . . cannot utilize the protest system to obtain the proverbial second bite at the apple."  *Candle Corp. v. United* States, 40 Fed. Cl. 658, 665-66 (1998) (citations omitted); *see also Glob. Dynamics, LLC v. United States*, 130 Fed. Cl. 211, 215-16 (2016) (finding that even when an RFP is ambiguous, a bidder's "business judgment" is insufficient basis to upset an award); *Gulf Grp., Inc. v. United States*, 61 Fed. Cl. 338, 364 (2004) (when a bidder's interpretation of an RFP creates a discrepancy, "it should have sought to clarify before submitting an offer"), *abrogated in part on other grounds recognized by Telos Corp. v. United States*, 129 Fed. Cl. 573, 576 n.2 (2016); *Gen. Dynamics Info. Tech., Inc.*, B-417616.2, 2020 WL 1659847, at *10 (Comp. Gen. Mar. 31, 2020) (rejecting protest when an offeror makes "an independent business judgment about how to respond to the" RFP).  Plaintiff's business judgment provides no ground to supplant the Navy's consideration of proposals.

Accordingly, the Navy did not ignore any preference in the RFP and its evaluation complied with the RFP.

### 2.    Consideration of Technical Specifications.

IAP next argues that the Navy failed to consider that IAP's submitted projects documented experience in a greater number of technical specifications than the projects that VJFS submitted, which Plaintiff insists required the Navy to consider Plaintiff's experience more favorably than Intervenor's. Pltf.'s MJAR at 14.  Particularly at issue are VJFS's projects [ … ], which only demonstrated experience in approximately half of the PWS technical specifications. *Id*.  Project [ … ] demonstrated experience in nine specifications, Project [ … ] demonstrated seven specifications, and Project [ … ] demonstrated six specifications.  *See* AR Tab 58 at 12391-405; AR Tab 55b at 12293-303.  All IAP's past projects demonstrated experience in twelve specifications or greater with one project demonstrating all fourteen.  *See* AR Tab 58 at 12371-80.  IAP argues that had the Navy considered VJFS's minimal experience with the technical specifications, the relevancy ratings on Projects [ … ] would have been lower.  *See* Pltf.'s MJAR at 14-16.

Plaintiff's argument misconstrues the terms of the RFP.  The RFP states that projects would be considered relevant if they met the threshold criteria listed in RFP § L.6.  AR Tab 80a at 14051.  There is no dispute that each of the projects VJFS submitted met each of these requirements.  The plain language of the RFP creates a threshold requirement, but it does not

indicate in any way that projects demonstrating experience with more technical specifications would be considered more favorably. But when the Navy intended to provide more favorable treatment for technical specifications, it did so explicitly. Here, the RFP provided: "Projects performed by the Offeror that demonstrate its experience in technical specification 1605000 (Steam…) and/or technical specification 1607000 (Chiller Plant) may be considered more favorably than projects submitted for evaluation without such experience." *Id*. at 14052. There is no dispute that the Navy evaluated both IAP's and VJFS's projects documenting Steam and Chiller Plant work more favorably than projects that did not demonstrate these specifications. AR Tab 58 at 12391 (VJFS) & 12371 (IAP). In short, the Navy did exactly what the RFP required and there is no basis to set aside its reasoned judgment.

### 3. The Navy's errors in the consideration of the percentage of self-performance on prior projects were harmless error.

IAP's last non-price argument is that the Navy overstated the percentage of work VJFS self-performed on its past projects because it gave VJFS full credit for work performed by one of its members even though the member was in a venture with another entity for that project and sharing the work. Pltf.'s MJAR at 15. VJFS Project 1 was performed by [ … ] as a member of a populated JV with one other member, and that JV self-performed [ … ]% of the work. According to IAP, because VJFS Project 1 was performed jointly by [ … ] and another entity, the Navy was permitted to credit VJFS with no more than [ … ]% of the work because [ … ] split the work evenly with its venture partner. IAP makes the same argument about VJFS Project 2, which [ … ] also performed as part of another joint venture in which it shared the work. IAP's argument fails for several reasons.

First, as VJFS argues, IAP's own proposal clearly reflects its contemporaneous understanding that it would be entitled to full credit for all the work performed by a populated joint venture. *See* Int.'s MJAR at 16. As GAO decisions (and basic fairness) have long held, "[t]he integrity of the protest process does not permit a protester to espouse one interpretation or position during the procurement, and then argue during a protest that the interpretation or position is unreasonable or otherwise improper." *Facility Services Mgmt., Inc.*, B-418526, 2020 WL 3250212, at *5 (Comp. Gen. May 20, 2020); *Raytheon Co.*, B-417524.2, 2019 WL 7877827, at *7 (Comp. Gen. Dec. 19, 2019) (same); *Quotient, Inc.*, B-416473.6, 2019 WL 3824258, at *5 (Comp. Gen. July 30, 2019) (same); *cf. Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986) ("Where a contractor seeks recovery based on his interpretation of an ambiguous contract, he must show that he relied on his interpretation in submitting his bid.").

Here, IAP's Project 2 was performed by [ … ], a populated joint venture between Plaintiff and [ … ]. AR Tab 53b at 10936. In response to the RFP's requirement to explain the amount of work that was self-performed, IAP stated that it "self-performed [ … ]% of the work." *Id*. at 10937 (*see* Box 9). This representation must be claiming full credit for the portion of the work that was self-performed by the JV, not the Plaintiff here, on this project because IAP itself only employed [ … ] individuals that were seconded to the joint venture, which independently employed approximately [ … ] employees. *Id*. at 10936. It is inconceivable that [ … ] IAP employees could have performed [ … ]% of the work completed by the joint venture, leaving approximately [ … ] people to perform the remaining [ … ]%. Given its clear understanding of the RFP reflected in its proposal, IAP cannot argue against that understanding now.

IAP's effort to refute VJFS's argument similarly fails to comport with IAP's own proposal.  According to IAP, it was a [ … ]% owner of [ … ] and, therefore, responsible for [ … ]% of the JV's the work, but only claimed [ … ]%.  Pltf.'s MJAR at 26 (table of past projects claiming [ … ]% self-performed); Pltf.'s Reply at 11 n.6 (stating "IAP" only claimed [ … ]% self-performed work).  This argument is belied by IAP's proposal itself, which states that "IAP self-performed [ … ]% of the work."  AR Tab 53b at 10937; *see also* Pltf.'s Reply at 11 n.6 ("IAP was therefore credited with [ … ]% responsibility, IAP only claimed [ … ]% self-performance.").  But IAP's project description defines "IAP" to mean the [ … ] joint venture, *not* the Plaintiff here: "**Firm Name**: [ … ]*, (IAP) a populated joint venture* between IAP World Services, Inc. ([ … ]%) and [ … ] ([ … ]%)."  AR Tab 53b at 10936 (emphasis added).  Thus, the proposal states that the [ … ] joint venture self-performed [ … ]% of the work, not that Plaintiff performed [ … ]% of the joint venture's work.  Even in its last filing before this Court, IAP is claiming full credit for all the work performed by its populated joint venture rather than a percentage of that work based on its membership in the JV—precisely what it claims to have been improper with the Navy's evaluation of VJFS.  Such an argument fails on its own terms.

Second, even if Plaintiff could pursue its argument, it cannot show prejudice from the Navy's mistaken evaluation of the work self-performed by offerors.  As the Government and VJFS counter, to the extent the Navy made any error regarding the percentage of self-performance, it made that error for all proposals and this error *benefitted* IAP, negating any prejudice.  Of course, if correcting the error would decrease IAP's chance of award, it cannot establish prejudice.  *Data Gen.*, 78 F.3d at 1562 ("[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract."); *cf. id.* ("'Generally, the requirement of proving prejudice prevents an unsuccessful bidder from overturning a contract award due to a harmless violation of a statute or regulation on the part of the government.'") (quoting *TRW Envtl. Safety Sys., Inc. v. United States*, 18 Cl. Ct. 33, 67 (1989)).

As relevant here, the RFP provides:

> If a project was performed by a JV, and not all partners from that JV are on the JV proposed for this contract, the *Offeror shall clearly demonstrate what portion of the work on the submitted project was performed by the JV partner offering on this contract* and shall not include work performed by the JV as a whole.

RFP § L.6, AR Tab 80a at 14051-52 (emphasis added).  IAP argues that in order to comply with this provision, the Navy was required to lower the percentage of self-performance for VJFS Project Nos. 1 and 2 each by 50% because those were performed by VJFS members as part of other joint ventures where the VJFS member was responsible for half the work.  Pltf.'s MJAR at 15.  IAP summarized the corrections it claims to be necessary in the following table:

| VJJ's Past Projects | | | | |
|---|---|---|---|---|
| Project | PWS Annexes Demonstrated (14 Total) | Performing Entity | Percent of Work Self-Performed | Rating |
| No. 1 | [ … ] | [ … ] JV, LLC | [ … ]% | Somewhat Relevant |
| No. 2 | [ … ] | [ … ] (a JV) | [ … ]% | Very Relevant |
| No. 3 | [ … ] | Vectrus | [ … ]% | Very Relevant |
| No. 4 | [ … ] | Vectrus | [ … ]% | Somewhat Relevant |
| No. 5 | [ … ] | J&J | [ … ]% | Relevant |

Pltf.'s MJAR at 25 (citing AR Tab 58 at 12391-405 & AR Tab 55b at 12287-303). As reflected above, IAP's calculated totals for Project Nos. 1 and 2 are 50% of what was credited by the Navy. *See id.* at nn.9-10.

IAP also prepared a similar table of the Navy's evaluation of its own proposal:

| IAP's Past Projects | | | | |
|---|---|---|---|---|
| Project | PWS Annexes Demonstrated (14 Total) | Performing Entity | Percent of Work Self-Performed | Rating |
| No. 1 | [ … ] | IAP | [ … ]% | Very Relevant |
| No. 2 | [ … ] | [ … ] (a JV) | [ … ]% | Very Relevant |
| No. 3 | [ … ] | IAP | [ … ]% | Very Relevant |
| No. 4 | [ … ] | IAP | [ … ]% | Relevant |

*Id.* at 26 (citing AR Tab 58 at 12371-80). As the Government and VJFS point out, IAP reported self-performance of work at significantly lower rates than considered by the Navy: Project 1 – [ … ]%; Project 2 – [ … ]%; Project 3 – [ … ]%; and Project 4 – [ … ]%. AR Tab 53b at 10934, 10937, 10940, & 10943.

The Government and VJFS turn IAP's own argument against it. Assuming Plaintiff is correct, and the Navy must correct its evaluation of VJFS's proposal, it must also do so for IAP.

Based on IAP's proposal, such a correction, according to VJFS, would require the following changes:

| Amount of Over-Credit to VJFS (as Alleged by IAP) | | | |
|---|---|---|---|
| | Self-Performance Credited to VJFS (Vectrus/J&J) by Agency | Amount of Self-Performance that Should have been credited to VJFS (Vectrus/J&J) according to IAP's MJAR | Amount of Over-Credit to VJFS (alleged by IAP) |
| VJFS Project #1 | [ … ]% | [ … ]% | 37% |
| VJFS Project #2 | [ … ]% | [ … ]% | 31% |
| VJFS Project #3 | [ … ]% | [ … ]% | 0% |
| VJFS Project #4 | [ … ]% | [ … ]% | 0% |
| VJFS Project #5 | [ … ]% | [ … ]% | 0% |
| | | | *Average 13.6% over-credit across five projects* |

| Amount of Over-Credit to IAP (Based on IAP's Self-Performance Percentages Actually Represented in its Proposal) | | | |
|---|---|---|---|
| | Self-Performance Credited to IAP by Agency | Amount Self-Performance Claimed by IAP in its Proposal | Amount of Over-Credit to IAP |
| IAP Project #1 | [ … ]% | [ … ]% | 44% |
| IAP Project #2 | [ … ]% | [ … ]% | 7% |
| IAP Project #3 | [ … ]% | [ … ]% | 23.8% |
| IAP Project #4 | [ … ]% | [ … ]% | 27% |
| | | | *Average 25.45% over-credit across four projects* |

Int.'s MJAR at 25.  Even though VJFS's math is wrong (the Navy over-credited Project 1 by 34%, not 44%), the point is still the same – the Navy over-credited IAP by at least 22.95%,[5] while over-crediting VJFS by 13.6%.  Because correcting this error on Plaintiff's terms would lessen IAP's chances of receiving the award rather than enhance them, IAP was not prejudiced by it.

IAP's efforts to rebut this argument fail.  First, IAP urges the Court not to get "bog[ged] . . . down in the weeds of specific percentages." Pltf.'s Reply at 8.  While this Court would prefer nothing more than to avoid specific percentages and the proper calculation of them, it is quite hard to do when the argument under consideration argues that those same percentages are incorrect and must be recalculated.

Second, IAP argues that the self-performance issue only applies to projects performed by JVs and, therefore, self-performance was irrelevant to IAP's proposal because it was not offering as a JV. *Id*. at 11.  Contrary to IAP's argument, the RFP clearly requires that "[f]or *each project* the Offeror shall complete the Corporate Experience Project Data Sheet included as Attachment J-6) [sic] and all information shall be provided as requested on the form."  RFP § L.6, AR Tab 80a at 14052 (emphasis added).  The Corporate Experience Project Data Sheet clearly requires each offeror to document the amount of work it performed for each project, regardless of whether the offeror is a JV. *E.g.*, AR Tab 40 at 10934 ("9. Provide a detailed description of what work your firm self-performed on this project.").

Finally, IAP contends that the Government's and VJFS's argument is nothing more than an improper effort to get the Court to "ignore the Navy's flawed evaluation of [VJFS], that is not only untrue but entirely speculative and *post hoc*," Pltf.'s Reply at 11, and not entitled to any weight because the argument is the product of litigation. *Id*. at 11-12 (citing *Fluor*, 147 Fed. Cl. at 334).  Plaintiff's argument, however, misses the mark.  Unlike *Fluor*, the analysis here is not something that was created "in the heat of litigation."  Instead, the Government and VJFS are arguing a lack of prejudice based on the Record as it existed before the Navy; they are not creating a *post hoc* rationalization for what the Navy did.  This is permissible. *See, e.g., Consol. Eng'g Servs., Inc. v. United States*, 64 Fed. Cl. 617, 629-32 (2005) (analyzing the record to determine prejudice).

## B. The Record does not reflect any consideration of unbalanced pricing, which was mandatory under the FAR and the RFP.

IAP's second challenge to the Navy's award to VJFS is its best.  Specifically, IAP argues that the Navy failed to conduct any analysis of unbalanced pricing in violation of 48 C.F.R. § 15.404-1(g), which allegedly concealed a significant risk to the Government and prejudiced IAP. As explained below, IAP is correct that the Record is devoid of any indication that the Navy analyzed proposals for unbalanced pricing.

---

[5] If Plaintiff was correct that all projects of populated joint ventures needed to be decreased to account for the work performed by the other member of the joint venture, then IAP's Project would actually need to be reduced further to [ … ]% because Plaintiff claims to have been responsible for [ … ]% of the [ … ]% of self-performed work.

1.      The Court may consider IAP's challenge to the Navy's price evaluation.

IAP raised its argument about unbalanced pricing for the first time in its MJAR. Thus, none of the five counts IAP pleaded in the Complaint address unbalanced pricing. Under the Court's Rules, "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." RCFC 15(b)(2). Here, the Government explicitly consented to IAP arguing this issue without amending the Complaint. Pltf.'s MJAR at 17 n.5 (representing that the Government "stated by e-mail correspondence on October 1, 2020 that it did not object to IAP's challenge to the Navy's price evaluation without amendment to the complaint"). While it is not stated whether VJFS explicitly consented as well, its implied consent can be found in the fact that it spent significant effort briefing and arguing against IAP's challenge to the Navy's price evaluation without contesting the fact that IAP's challenge was not raised in the Complaint. Moreover, given the ample opportunity for the Government and VJFS to argue this issue, neither are prejudiced by the Court's consideration of it. Therefore, the Court will consider IAP's arguments regarding unbalanced pricing as if they had been raised in the Complaint. *See* RCFC 15(b)(2) (providing that "failure to amend does not affect the result of the trial of that issue").

2.      The FAR and the RFP required the Navy to analyze proposals for unbalanced pricing.

The FAR requires a two-step analysis to identify and address unbalanced pricing. Specifically, the FAR provides "[a]ll offers with separately priced line items or subline items *shall* be analyzed to determine if the prices are unbalanced." 48 C.F.R. § 15.404-1(g)(2) (emphasis added). "Unbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more line items is significantly over or understated as indicated by the application of cost or price analysis techniques." 48 C.F.R. § 15.404-1(g)(1). Then, "[i]f cost or price analysis techniques indicate that an offer is unbalanced, the contracting officer *shall* - (i) Consider the risks to the Government associated with the unbalanced pricing in determining the competitive range and in making the source selection decision; and (ii) Consider whether award of the contract will result in paying unreasonably high prices for contract performance." *Id.* (emphasis added).[6]

In addition to the FAR's requirement to perform the analysis, the RFP confirms that the Government was required to perform an unbalanced pricing analysis when it advised offerors

---

[6] The Government and VJFS argued at length that IAP's challenge was facially defective because it purportedly faulted the Navy for failing to consider the risk of unbalanced pricing without first finding that one or more of the proposals contained unbalanced pricing. *See* Def.'s MJAR at 35-36; Int.'s MJAR at 31-32, 35-36. These arguments are unavailing. First, as explained below, the Record does not reflect that the Navy performed the first step of the mandatory analysis, *i.e.*, whether there was unbalanced pricing, which is sufficient on its own to justify remand to the Navy. Second, it appears to the Court that IAP was not arguing that the Navy was required to perform the risk analysis regardless of whether there was unbalanced pricing; rather, it argued that the Navy did not perform the analysis at all and, as a result, missed unbalanced pricing. Finally, to the extent IAP made such an argument, it disavowed it during oral argument. Hearing Tr. at 60:16-61:1.

that "[t]he Government may determine that a proposal is unacceptable *if the prices proposed are materially unbalanced between line items or subline items*…. A proposal may be rejected if the Contracting Officer determines that the lack of balance poses an unacceptable risk to the Government." 48 C.F.R. § 52.215-1(f)(8) (emphasis added); *see also* RFP § L.7, AR Tab 80a at 14058 (incorporating 48 CFR § 52.215-1). Because this provision would be meaningless unless the Government conducts an unbalanced pricing analysis, the RFP includes a requirement to perform the unbalanced pricing analysis. *E.g., Nielsen-Dillingham Builders, J.V. v. United States*, 43 Fed. Cl. 5, 9 (1999) (rejecting an argument regarding the meaning of an RFP that would render portions of the RFP meaningless or surplusage because "[t]he court is precluded from entertaining such an interpretation") (citations omitted).

### 3.   The Record does not reflect any unbalanced pricing analysis.

Although the FAR and RFP required the Government to analyze proposals for unbalanced pricing, there is not a single mention of "balanced" or "unbalanced" anywhere in the Record, which is comprised of more than 15,000 pages. *See* Pltf.'s Reply at 13; Def.'s MJAR at 34 n.8. While it is true that there is no requirement that the Government use any "magic words" in performing the unbalanced pricing analysis, the Record must reflect that the analysis was done. *E.g., Al Ghanim Combined Grp. Co. Gen. Trad. & Cont. W.L.L. v. United States*, 56 Fed. Cl. 502, 514 (2003) ("[T]he administrative record does not show that the [Government] performed a cost analysis whereby the individual CLIN prices were analyzed, and the court cannot assume that an analysis was performed where the record indicates otherwise."). Here, it does not.

#### a)   *The Navy's price analysis.*

At the outset, it is important to understand the price analysis that the Navy conducted during this procurement. First, the PET confirmed that the proposals satisfied submittal requirements, including *inter alia* whether they were properly signed, included necessary certifications, financial information, and agreements. AR Tab 56 at 12356.

Second, the PET validated the prices submitted by each offeror. *Id.* at 12357. To calculate validated prices, the Government "used the proposed unit prices submitted in the Offerors' hard copy proposal[s], [and] multiplied [them] by the unit of issue provided by the Government's Section J-0200000-16 ELIN schedule as revised via Amendment 0012." *Id.* In other words, the Government confirmed that each Offeror's arithmetic was correct by multiplying unit prices by estimated unit purchases. The results of this validation are presented in a table showing the prices for recurring and non-recurring work for the base and each option period for each offeror and the IGCE. Where there were errors, the Government's calculated totals were used for the evaluation. *Id.*

Third, the PET compared the total validated prices to the IGCE. *Id.* at 12358. The PET Report presents this analysis in a table showing differences between each offeror's price and the IGCE in both dollars and percentage terms. The PET Report also reflects that the Government compared each offer's total evaluated price against each other in terms of both dollar and percentage differences. AR Tab 56 at 12358. The PET Report additionally includes Attachment A, *see* AR Tab 97, which is described as "an abstract/summary of the comparison of each

Offeror's proposed total price and validated total price, by Contract Line Item Number (CLIN), as well as an abstract/summary of the comparison of the IGCE and validated ELIN prices for each period of performance." AR Tab 56 at 12357. Although the PET Report states that Attachment A includes a comparison of validated ELIN prices to the IGCE, nothing in Attachment A reflects that ELINs were compared to the IGCE. *See* AR Tab 97 at 14861-15076 (tables including ELIN prices only for the three offerors in the competitive range). Moreover, Attachment A's table of ELINs only covers the base period, not the option periods. *Id*.

> b)    *A price reasonableness analysis is not an unbalanced pricing analysis.*

All that can be gleaned is that the Navy conducted a price reasonableness analysis. *See* AR Tab 56 at 12359 ("Based on the analysis of price and the required proposal documentation, all Offerors' price proposals are considered fair and reasonable."). But determining a price is fair and reasonable is a far cry from finding that there is no unbalanced pricing in a proposal. "'The purpose of a price reasonableness analysis is to prevent the Government from paying too high a price for a contract.'" *Tech. Innovation Alliance, LLC v. United States*, 149 Fed. Cl. 105, 141 (2020) (quoting *Patriot Taxiway Indus. v. United States*, 98 Fed. Cl. 575, 587 (2011)) (additional citations omitted). Thus, the FAR provides that "[n]ormally, adequate price competition establishes a fair and reasonable price." 48 C.F.R. § 15.404-1(b)(2)(i). Unsurprisingly, the Navy provided weight to the fact that it had obtained adequate price competition in making its determination that the proposals' prices were fair and reasonable, stating "the Government received two or more independent proposals and achieved adequate price competition. In accordance with FAR 15.404-1(b), adequate price competition (i.e. two (2) or more responsible Offerors competing independently) is a valid, stand-alone technique to establish price reasonableness." AR Tab 56 at 12359. While it is true that the Government may rely upon price analysis techniques to identify unbalanced pricing, the unbalanced pricing analysis focuses on whether a proposal's pricing structure hides over or understated prices for line items, creating risks to the Government. 48 C.F.R. § 15.404-1(g). Clearly, unbalanced pricing cannot be evaluated by simply looking to see whether total prices are too high or whether there was adequate competition.

Although the SSEB reviewed the proposals' prices as well as the PET Report, it did not conduct any additional analysis of its own. According to the SSEB Report, the SSEB incorporated the PET Report and referred readers to it for "details as to the price findings for each offer." AR Tab 57 at 12363. But, the SSEB "made no further findings" with regard to price "[b]eyond the findings" in the PET Report. *Id*.

Similarly, the SSAC then reviewed the SSEB Report and the proposals so that it could make an award recommendation to the SSA. *See* AR Tab 59. Like the PET before it, the SSAC determined that all proposals were fair and reasonable, in part because of adequate competition. AR Tab 59 at 12437. But the SSAC considered only the total evaluated prices for each proposal, not CLINs or ELINs, to determine whether any proposals contained unbalanced pricing. *See id*. at 12438 ("VJFS submitted the second lowest price proposal at $154,100,049.03, as compared to IAP's price of $168,337,041,16, which is $14,236,993.03 or approximately 9.24% more than VJFS' proposed price.").

23

Finally, in the Source Selection Decision Document ("SSDD") the SSA documented only that she considered whether the proposals were fair and reasonable. AR Tab 60 at 12444 ("III. PRICE EVALUATION"). Here too, there is no analysis beyond reliance on the PET Report and SSAC Report. Nothing indicates that the SSA ever considered whether there was unbalanced pricing in any of the proposals.

According to the Government, however, "the Navy looked at individual line items for each proposal, the breakdown between the aggregate recurring and non-recurring work totals, and the break-down of these line items and aggregate totals between the different option years; in each case the comparison was done within a given offeror [sic] and across all offers." Def.'s MJAR at 33 (citing AR Tabs 56 & 97). As explained above, the Record does not support this assertion; rather, it shows that the only documented analysis is of total prices and for price reasonableness. To the extent there was any analysis of whether proposals contained unbalanced pricing or that any analysis was conducted "within a given offer[]," it is not in the Record. When the Record does not reflect that the agency conducted an unbalanced pricing analysis, the Court cannot presume that it was done. *Al Ghanim*, 56 Fed. Cl. at 514.

Moreover, the Government's argument calls into question whether any proper analysis was done here. Specifically, the Government argues that the Navy "specifically compared the awardee's base and option year CLIN pricing." Def.'s Reply at 12 (quoting *Munilla Construction Management, LLC v. United States*, 130 Fed. Cl. 635, 652 (2017)) (alterations omitted). Relying on *Munilla*'s conclusion that the risk of unbalanced pricing in firm fixed-price contracts is between the base and option periods, the Government asserts the Navy conducted a proper analysis and "[n]o more is required." But the Government's argument ignores that the Navy itself understood the Non-Recurring Work does not operate as a firm fixed-price contract. As the Navy explained it before the GAO:

> Recurring Work CLINs are [firm fixed-price] CLINs, in which the Agency pays a fixed price for a certain set of defined services over the course of that period of performance. Non-Recurring Work CLINs operate in an IDIQ manner, with orders being placed at established rates for certain work items on an as-needed basis.

AR Tab 80 at 13542. Thus, within each period of performance, there could certainly be a risk associated with unbalanced pricing—*i.e.*, some tasks being overpriced while others are underpriced.[7] Neither the Record nor the Government in this litigation explain why there was no consideration of unbalanced pricing within the Non-Recurring Work within each period of performance.

The cases the Government and VJFS rely upon to support their argument that the Navy properly evaluated proposals for unbalanced pricing are easily distinguishable. For example, *Survival Systems, U.S.A., Inc. v. United States*, 102 Fed. Cl. 255 (2011), which the Government and VJFS rely upon for the proposition that "the FAR does not require that the agency set out a

---

[7] The Navy can certainly focus its unbalanced pricing analysis on the portions of proposals it finds to present the most risk. That said, it must explain its rationale for focusing where it does and document that rationale on the Record during the remand.

separate analysis specifically for unbalanced pricing and instead permits an agency to rely on cost or price analysis techniques," 102 Fed. Cl. at 271 (citing 48 C.F.R. § 15.404-1(g)(1)), is easily distinguished because the record in *Survival Systems*, unlike the Record before this Court, clearly showed that the Government conducted an unbalanced pricing analysis. In fact, the court in *Survival Systems* found "the reasonableness of the agency's statement that it evaluated for unbalance . . . *together with the record* of the agency's price analysis, in which the *agency specifically compared [defendant-intervenor's] price for mobilization with its prices for services during the base year and compared the sum of [defendant-intervenor's] 'base year and mobilization costs' to the price of its option year services* . . . support the agency's conclusion that it 'did not find [defendant-intervenor's] price proposal to be unbalanced . . . .'" *Id.* at 272 (emphasis added). Nothing in the Record here indicates any similar analyses.

Similarly, *Munilla*, 130 Fed. Cl. 635, fails to support the Government here because there too the record clearly showed an unbalanced pricing analysis was performed. According to *Munilla*, "the Contracting Officer evaluated the Contractors' proposed prices for Base Year and Option[ ] I through Option IV to determine whether unbalanced pricing occurred in accordance with FAR 15.404–1(g)(2)." *Id.* at 641. Moreover, in *Munilla* the record showed that the Government substantively compared prices for each option period[8] and "identified the reasons for these increases." *Id.* at 641-43. The same is true of *Ceres Envtl Servs., Inc. v. United States*, 97 Fed. Cl. 277, 296 (2011), where the Court found that "[i]n accordance with FAR 52.215-(1)(f)(8), the Government evaluated the offers to determine if the proposed prices were materially unbalanced between line items or sublime items". No similar analysis is found in the Record here.

4.   <u>The Navy's failure to evaluate proposals for unbalanced pricing was not harmless error.</u>

According to IAP, the Navy's failure to analyze unbalanced pricing caused it to wholly overlook significant risk arising from VJFS's allegedly unbalanced pricing. Pltf.'s MJAR at 20-23. The Government and VJFS, however, argue that even if the Navy failed to perform a proper unbalanced pricing analysis, IAP's argument must fail because IAP failed to show any unbalanced pricing. *See* Def.'s MJAR at 34-35; Int.'s MJAR at 36-43.

In addressing the prejudice requirement when reviewing the failure to perform unbalanced pricing, members of this court have approached the question of prejudice differently. In *Al Ghanim*, the court confronted the arguments the Government and VJFS make here, holding that "[a]lthough plaintiff and defendant focus much of their arguments regarding pricing on whether [awardee's] proposal evidenced unbalanced pricing, the court declines to speculate on what the analysis would have revealed. The omission is a price analysis; the court finds that the Corps did not evaluate the ratio between the CLINs." *Al Ghanim*, 56 Fed. Cl. at 515-16. Further, the failure to perform the mandatory analysis "constitutes a 'significant . . . error in the procurement process.'" *Id.* at 516 (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)). Finally, the *Al Ghanim* court held the failure to be prejudicial

---

[8] Because the contract at issue in *Munilla* was a firm fixed price contract, the Navy determined the greatest risk of unbalanced pricing to be across option periods rather than within a specific option period. *Munilla*, 130 Fed. Cl. at 650-51.

when "the protestor can show that, if its post-award bid protest were granted and the solicitation were reopened, it 'could compete for the contract once again.'"  *Id.* (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed. Cir. 2001)).  Plaintiff here clearly intends to continue to compete going forward, satisfying this requirement.  Similarly, *Green Technologies, Group, LLC v. United States*, 147 Fed. Cl. 231 (2020), declined to find harmless error when the agency failed to adequately perform the mandatory risk analysis after finding unbalanced pricing and enjoined the award based on the failure to perform a mandatory analysis.  147 Fed. Cl. at 245-46; *cf. Active Network, LLC v. United States*, 130 Fed. Cl. 421, 429 (2017) ("Without a price realism analysis in the record, the Court has nothing to review and no way of determining whether Active was prejudiced.  This conclusion alone is sufficient to warrant remand to conduct a proper price realism analysis.").

On the other end of the spectrum is *Advanced Concepts Enterprises, Inc. v. United States*, No. 15-75, 2015 U.S. Lexis 1115 (Fed. Cl. Sept. 2, 2015), which holds that even if the Government failed to perform a proper unbalanced pricing analysis, the plaintiff could not prevail unless it could demonstrate a material unbalance.  *Advanced Concepts* is unpersuasive for several reasons.  First, it is not the Court's proper place to presume what an analysis would have shown or to perform the unbalanced pricing analysis for the Government.  Second, although not a model of clarity, *Advanced Concepts* appears to conclude that there was no prejudice because "the FAR provides that the CO 'may reject' an unbalanced proposal . . . .  As such, the CO was not required to reject [awardee's] proposal, even if it [sic] found an imbalance."  *Id.* 2015 U.S. Lexis 1115, at *30 (internal citation omitted).  This conclusion would, if taken to its logical conclusion, mean that there could never be a protest regarding unbalanced pricing because the FAR does not mandate rejecting proposals containing unbalanced pricing.

Therefore, this Court agrees with the *Al Ghanim* and *Green Tech* line of cases and concludes that Plaintiff has adequately shown prejudice from the Navy's failure to perform an unbalanced pricing analysis.  Therefore, the Court will remand the procurement to the Navy to allow it to perform an unbalanced pricing analysis and revise decision documents.

### C.    The Navy's best value determination was rational.

Because the Court is remanding the procurement to the Navy to conduct an unbalanced pricing analysis, the Navy's best value tradeoff will be updated during the remand.  The Court's opinion here addresses only the arguments IAP makes based on the current Record and does not preclude or limit any different challenge to the best value determination on remand.

IAP alleges that the Navy failed to follow the RFP and perform "a comparative analysis of the proposals and a best-value tradeoff analysis to award to 'other than the lowest priced Offeror or other than the highest technically rated Offeror.'"  Pltf.'s MJAR at 23 (quoting AR Tab 80a at 14060); *see also* 48 C.F.R. § 15.101-1(a) ("A tradeoff process is appropriate when it may be in the best interest of the Government to consider award to *other than the lowest priced offeror or other than the highest technically rated offeror*.") (emphasis added).  IAP contends that the best value tradeoff here was "fundamentally infected" by the Navy's underlying "unreasonable evaluations" of the RFP's Past Performance and Price factors.  Pltf.'s MJAR at 24.  IAP further argues that the Navy's comparative analysis did not look past adjectival ratings, thereby failing to evaluate IAP's and VJFS's respective benefits and risks.  *Id.*  And in turn, IAP

asserts that the Navy "formulaically" offset its technical factors' ratings and "discounted" its "advantages" over VJFS. *Id.* at 27. The Court disagrees.

Under the FAR, the SSA's best value tradeoff "shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation." 48 C.F.R. § 15.308. "To determine whether and to what extent meaningful differences exist between proposals, the agency should consider both adjectival ratings and information on the proposals' advantages and disadvantages." *Blackwater Lodge & Training Ctr., Inc. v. United States*, 86 Fed. Cl. 488, 514 (2009). Adjectival ratings by themselves are not determinative because "[p]roposals with the same adjectival rating are not necessarily of equal quality . . . ." *Metcalf Const. Co. v. United States*, 53 Fed. Cl. 617, 641 (2002) (quoting *Oceaneering Int'l, Inc.*, B-287325, 2001 WL 695072, at *10 (Comp. Gen. June 5, 2001)).

When performing a best value tradeoff analysis, an agency receives substantial discretion. *See E.W. Bliss Co.*, 77 F.3d at 449 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government."). More specifically, where a contract will be awarded to the offeror providing the best value, the SSA "ha[s] a great deal of discretion" in deciding the contract award. *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1355 (Fed. Cir. 2004). "An agency has the discretion to select a lower-priced, lower-technically-rated proposal if it decides that the higher price of a higher-technically-rated proposal is not justified, even if the solicitation emphasizes the importance of technical merit." *Blackwater Lodge*, 86 Fed. Cl. at 514. And "[w]here agency officials reasonably and properly exercise their discretion when conducting a best value analysis, the Court will not disturb an agency award." *Id.*

      1.    The Navy's best value tradeoff analysis reasonably considered price and technical factors.

IAP's contention that the Navy conducted an unreasonable best value tradeoff analysis of Past Performance and Price is unsupported by this Record. IAP's initial arguments largely rehash its arguments about what ratings a "proper" technical evaluation would have generated based on the projects that IAP and VJFS submitted for consideration. Specifically, IAP argues it and VJFS were not equal in Corporate Experience and Past Performance because of the greater experience documented by IAP's past projects and its purportedly greater percentage of self-performance. Pltf.'s MJAR at 24-27. These arguments fare no better here than they do challenging the Navy's technical evaluation. For example, as explained above, there was nothing in the RFP requiring (or permitting) the Navy to treat IAP's projects more favorably because they demonstrated experience in more technical specifications. Nor was IAP prejudiced by the Navy's failure to properly assess the percentage of self-performance on each project, which helped IAP. Because there was nothing arbitrary or irrational in these conclusions, it necessarily follows that they did not taint the best value tradeoff.

      2.    The Navy did not rely solely on adjectival ratings when comparing IAP's and VJFS's proposals.

IAP's argument that the Navy's comparative analysis failed to look past adjectival ratings to evaluate IAP's and VJFS's respective benefits and risks fails to demonstrate any arbitrary or

capricious conduct. Adjectival ratings guide agencies with comparing offerors' proposals during a best value tradeoff analysis. *See Tech. Innovation*, 149 Fed. Cl. at 145-46 ("Indeed, the Court cannot imagine how the agency could have conducted the best value tradeoff in this procurement, without relying on the adjectival ratings to guide the comparison of the proposals."). IAP specifically argues that "[t]he failure is most egregious in the SSAC's conclusion that IAP's and VJJ's Past Performance, both assigned a Substantial Confidence rating, were 'essentially equal in this factor and that neither offeror has an advantage.'" Pltf.'s MJAR at 25 (quoting AR Tab 59 at 12438-39). The SSAC Report states that:

> The two offerors [(IAP and VJFS)] were found to be essentially
> equal in past performance, with both offering Substantial
> Confidence. However, even if IAP were considered to have a
> slight advantage due to its documenting strong performance on
> four Very Relevant projects versus VJFS's two Very Relevant, one
> Relevant and two Somewhat Relevant projects, the SSAC finds
> that such a slight difference does not offer any significant
> reduction in performance risk and is certainly not worth a price
> premium of 9.24%. Therefore, the SSAC determines that the
> significant difference in price between the offerors outweighs the
> slight non-price advantage offered by IAP, which makes VJFS the
> best value of these Offerors.

AR Tab 59 at 12439. Here, the SSAC did not merely rely on IAP's and VJFS's adjectival ratings of Substantial Confidence, but reasonably compared IAP and VJFS, even hypothesizing a scenario where IAP had a slight advantage and again finding that any benefit in reduced performance risk was simply not worth the higher price. *See id*. This contemporaneous Record undermines IAP's argument because it demonstrates that the Navy would not have changed the award decision even if it found IAP's past performance to have been more advantageous.

### 3. The Navy reasonably compared IAP's and VJFS's history of utilizing small business concerns.

IAP further contends that the SSAC's comparative analysis "ignored IAP's similarly strong history of supporting and utilizing small businesses (in fact, objectively better than [VJFS]) and unfairly penalizes IAP for historically setting aggressive small business utilization goals." Pltf.'s MJAR at 26-27. However, the SSAC made its evaluation in light of the TET Report, *see* AR Tab 58 at 12434, which accounted for both IAP's "demonstrated [] history of successfully supporting Government policies concerning utilization of small business concerns" and "good faith effort" to meet its "aggressive subcontracting goals in most of their subcontracting plans, and in several cases, IAP fell just short of their goal." AR Tab 58 at 12418.

The SSAC's comparative analysis does not ignore IAP's demonstrated history or penalize IAP for its aggressive small business utilization goals. To the contrary, the SSAC considered IAP's aggressive subcontracting goals a strength of its proposal. AR Tab 58 at 12435. There is nothing irrational about the Navy assigning an additional strength to VJFS for meeting its goals without awarding a strength to IAP when it had not met its goals on prior

projects (even though its goals were "aggressive").  In the end, even though the Navy assigned one more strength to VJFS's proposal, it still considered IAP and VJFS to be "essentially equal" on past performance.  AR Tab 59 at 12438.  IAP's argument boils down to a disagreement with the relative weight the Navy assigned to VJFS's and IAP's proposals.  But that is not sufficient to sustain a protest here because the Record reflects that the Navy substantively considered each of the proposals and came to a reasonable determination.  *Ceres*, 97 Fed. Cl. at 308 ("This Court does not sit as a super source selection authority to second guess agency procurement decisions. Rather, it is well established that the Court should not substitute its judgment to assess the relative merits of competing proposals in a Government procurement."); *see also* GAO Opinion, AR Tab 91 at 14606 ("[T]he relevant question is not whether the Navy unreasonably assigned a rating of 'good' as opposed to a rating of 'outstanding,' but whether the underlying evaluation record was reasonable.").

Here too, the GAO also considered this argument and similarly rejected it:

> the record shows that the Navy reviewed IAP's small business utilization proposal, and assigned three strengths and no weaknesses. AR, Tab 6, TET Report at 54-55.  The record shows that the agency considered both IAP's identified achievements and strategy in significant detail.  *Id.*; *see also* MOL at 44-45.  Further, IAP does not identify any aspect of its small business utilization proposal that the agency unreasonably evaluated or misconstrued. *See* Protest at 22; *see generally* Protester's Comments and Supp. Protest.  Thus, although IAP may assert that its proposal merited a higher rating, we do not find the agency's evaluation objectionable because our review shows that the Navy thoroughly and reasonably reviewed IAP's proposal under this factor.

AR Tab 91 at 14607.  Similarly, the Court finds that the Record demonstrates the Navy did not rely on adjectival ratings alone, but reasonably compared IAP's and VJFS's history of utilizing small business concerns and identified their underlying strengths and weaknesses.  *See* AR Tab 59 at 12437-38 (SSAC Report) & AR Tab 60 at 12445-46 (SSDD).

### 4.    The Navy's best value determination was consistent with the RFP and the law.

Finally, the Court concludes that the Navy did not "formulaically" offset IAP's technical ratings and discount its advantages over VJFS; rather, the Navy extensively documented its consideration of the relative merits of each proposal.  AR Tab at 12437-42.  As a result of these analyses, the Navy determined that IAP's proposal was more advantageous to the Government under the Corporate Experience factor (Factor 1) based on IAP's "greater depth and breadth of experience demonstrated." *Id.* at 12439.  The Navy similarly documented its determination that IAP's proposal had a "slight advantage" in Safety (Factor 3), *id.*, and VJFS's proposal had an "advantage" in Small Business Utilization (Factor 4) based on a "strong history of supporting and utilizing small businesses and exceeding socioeconomic goals."  AR Tab 59 at 12438. Factors 1, 3, and 4 were of equal importance to each other.  RFP § L.5, AR Tab 80a at 14047.

Based on its evaluations, the Navy concluded that IAP's proposal had a "slight advantage" when Factors 1, 3, and 4 were combined. AR Tab 59 at 12439.

The RFP further provides that Factors 1, 3, and 4 combined are equal in importance to Factor 5—Past Performance. RFP § L.5, AR Tab 80a at 14047. Therefore, when the SSAC considered all non-price factors, it considered IAP's "slight advantage" in Factors 1, 3, and 4 to be of equal importance as the "essentially equal" past performance ratings. Therefore, the SSAC concluded that IAP had a "very slight advantage" over VJFS for the non-price factors. *See id.* at 12439.

Finally, the RFP provides that the combined non-price factors (Factors 1, 3, 4, and 5) are of equal importance to price. RFP § L.5, AR Tab 80a at 14047. Further, "[t]he importance of price will increase if the offerors non-price proposals are considered essentially equal in terms of the overall quality, or if price is so high as to significantly diminish the value of a non-price proposal's superiority to the Government." *Id.* Here, the SSAC and SSA each determined that IAP's technical superiority was not worth the added cost. As the SSA put it, "the advantage IAP holds is not significant enough to warrant the approximately 9.24% price premium." AR Tab 60 at 12445. In other words, IAP's disadvantage in the Price factor (approximately half of the total evaluation score) outweighed its slight advantage in technical factors (approximately a quarter of the total evaluation score).

The Court holds that the Navy's comparative analysis and best value tradeoff analysis were consistent with the RFP, *see* AR Tab 80a at 14047; AR Tab 59 at 12433, and that the Navy reasonably used its discretion to determine that VJFS's offer represented the best value to the Government. Thus, the Court will not disturb the Navy's award. *Blackwater Lodge*, 86 Fed. Cl. at 514.

## V.   A remand is appropriate to allow the Navy to perform the unbalanced pricing analysis.

Having found that IAP has established a prejudicial violation of regulation regarding the Navy's failure to perform an unbalanced pricing analysis, the next question is what remedy is appropriate. Although IAP focuses on obtaining permanent injunctive relief, it also recognizes that remand may be appropriate here. As IAP recognizes, "[i]f the record before the agency does not support the agency action . . . , or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Pltf.'s MJAR at 17 (quoting *Ashbritt, Inc. v. United States*, 87 Fed. Cl. 344, 370, *opinion clarified*, 87 Fed. Cl. 654 (2009) (additional citations omitted)). For its part, the Government suggests that if the Court were to find a prejudicial error, "[t]he Court could stay the case and remand to the agency for corrective action, without imposing an injunction . . . ." Def.'s MJAR at 43. In any event, the Court may remand a matter on its own, if necessary. Rule of the Court of Federal Claims 52.2(a) ("In any case within its jurisdiction, the court, on motion or on its own, may order the remand of appropriate matters to an administrative or executive body or official.").

Here, a remand is particularly appropriate to allow the Navy to perform the missing analysis, allow appropriate officials to review it, prepare new decision documents, and move this

action to an efficient resolution.  The Court held a status conference with the Parties to address the proper remedy here.  Specifically, the Court informed the Parties that it believed remand to be a superior means of bringing this case to a prompt and just resolution and asked the Parties to confer regarding how much time the Navy would need to complete such an unbalanced pricing analysis.

On January 14, 2021, the Parties submitted a Joint Status Report informing the Court that the Navy "anticipates that it can be completed by February 3, 2021." ECF No. 55 at 1.  The Navy proposes that it will promptly notify the Parties and Court of the results and share decisional documents with counsel for IAP and VJFS.  *Id*. at 2.  The Parties further propose to provide a status report to the Court within 7 days of the conclusion of the unbalanced pricing analysis.  *Id*.  Finally, the Navy committed that it would not proceed with any contract performance transition activities up through at least the filing of the status report—*i.e.*, seven days after the conclusion of the analysis.  Based on the foregoing, the Court concludes that remanding this matter to the Navy for an unbalanced pricing analysis represents the best means of resolving this case.

## VI.    CONCLUSION.

For the reasons stated above, the Court GRANTS IN PART IAP's motion for judgment on the administrative record insofar as it seeks a remand to the U.S. Navy to perform the required unbalanced pricing analysis and update its award decision accordingly.  The Court DENIES IAP's motion with respect to the remaining issues.  Accordingly, the Court GRANTS IN PART the Government's and VJFS's cross motions for judgment on the administrative record on all issues other than unbalanced pricing.  Therefore, the Court ORDERS:

1)  The Clerk is directed to enter **Judgment** for the Government and Intervenor on Counts I-IV of Plaintiff's Complaint;

2)  The Court defers entering judgment on Count V regarding the Navy's tradeoff analysis until after the remand;

3)  Pursuant to RCFC 52.2, this case is **REMANDED** to the Navy until February 10, 2021 to perform an unbalanced pricing analysis consistent with the FAR, RFP, and Section IV.B of this Opinion.  This analysis must account for the different structures of the Recurring and Non-Recurring Work.  The Navy shall also update its price analyses in the decision documents (PET, SSEB, SSAC, and SSDD) to account for the findings of the unbalanced pricing analysis.  If the Navy finishes its analysis before February 10, 2021, it shall undertake the actions in No. 4 below on the date it completes the analysis;

4)  Upon completion of the unbalanced pricing analysis, the Government shall promptly notify the Parties and Court of the results and share decisional documents with counsel for IAP and VJFS.  The Parties shall then confer and file a Joint Status Report advising the Court of what, if any, further proceedings are necessary.  This Joint Status Report shall be filed within 7 days of the notice of the results of the remand analysis or February 17, 2021, whichever is earlier; and

5)  This case shall be **STAYED** during the remand.

**IT IS SO ORDERED**.

s/ Edward H. Meyers
Edward H. Meyers
Judge
